OPINION OF THE COURT

Per Curiam.

It is appropriate in the circumstances disclosed in this *465 record that petitioner be admonished for the appearances of impropriety stemming from appointments made by him of the sons of two other Judges during periods when such other Judges were making appointments of his son.
In June, 1978 a formal complaint was served on petitioner by the Commission on Judicial Conduct alleging four charges of misconduct arising out of petitioner's appointment of attorneys as guardians ad litem, receivers, referees and in one instance the committee of an incompetent in judicial proceedings pending before him. After hearings, the Referee appointed to hear and report to the commission found that two of the four charges had not been sustained. As to the other two charges, the Referee concluded that, while there was no basis for other criticism of petitioner’s conduct, two of the appointments of Burton Fine, the son of Mr. Justice Sidney Fine, and four of the appointments of Sanford Postel, the son of Mr. Justice George Posted, were not "free from the appearance of impropriety”. The Referee did not, however, find any actual impropriety.
The commission found that in the period from March, 1968 to November, 1974 petitioner appointed the son of Justice Fine on 2 occasions while Justice Fine appointed petitioner’s son on 8 occasions and appointed the son of Justice Posted on 10 occasions while Justice Posted appointed petitioner’s son on 5 occasions. The commission further found that at the time petitioner was making these appointments he was aware of the appointments of his son being made by the other Judges and concluded that, although there was no "quid pro quo” understanding, the cross appointments gave the "appearance of impropriety” in violation of Canon 4 of the Canons of Judicial Ethics and the applicable portion of section 33 of the Rules Governing Judicial Conduct. A majority of the members of the commission determined that the appropriate sanction was that petitioner be admonished. Three members of the commission, however, while adopting all the factual findings made by the Referee, concluded that such findings did not warrant the imposition of discipline under subdivision 7 of section 44 of the Judiciary Law.
Preliminarily, we note that, undoubtedly because we are the only court vested with power to review the commission’s determination, the scope of our review is unusually broad, encompassing as it does authority not only to "review the *466 commission’s findings of fact and conclusions of law”, but also to "impose a less or more severe sanction * * * than the one determined by the commission, or [to] impose no sanction”. (NY Const, art VI, § 22, subds a, d; Judiciary Law, § 44, subd 9.)[1] Thus, the issues before us include the correctness of the commission’s findings of fact and conclusions of law, as well as the appropriateness of the commission’s determination that petitioner be admonished, the lowest in the scale of sanctions prescribed for judicial misconduct. As a result of our review we accept the determination made by the commission.
It serves first to identify and to consider the nature of the judicial conduct which is the subject of this disciplinary proceeding. Our analysis recognizes two levels of consideration. The progression may be simply stated. First, nepotism is to be condemned, and disguised nepotism imports an additional component of evil because, implicitly conceding that evident nepotism would be unacceptable, the actor seeks to conceal what he is really accomplishing. Second, and this is peculiar to the judiciary, even if it cannot be said that there is proof of the fact of disguised nepotism, an appearance of such impropriety is no less to be condemned than is the impropriety itself.
Nepotism[2] in the judiciary was outrightly condemned when *467 the first Canons of Judicial Ethics were adopted by the American Bar Association in 1924.[3] Canon 12 as then adopted provided in pertinent part:
"Appointees of the Judiciary and Their Compensation.
"Trustees, receivers, masters, referees, guardians and other persons appointed by a judge to aid in the administration of justice should have the strictest probity and impartiality and should be selected with a view solely to their character and fitness. The power of making such appointments should not be exercised by him for personal or partisan advantage. He should not permit his appointments to be controlled by others than himself. He should also avoid nepotism and undue favoritism in his appointments.”
This unequivocal disapproval has been carried forward, undiminished, into the present Code of Judicial Conduct. Canon 3 (subd B, par [4]) now provides: "A judge should not make unnecessary appointments. He should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism. He should not approve compensation of appointees beyond the fair value of services rendered.”
A similar and more explicit injunction is now to be found in section 33.3 (subd [b], par [4]) of the Rules Governing Judicial Conduct (22 NYCRR 33.3 [b] [4], filed Jan. 21, 1974, effective Jan. 1, 1974): "A judge shall not make unnecessary appointments. He shall exercise his power of appointment only on the basis of merit, avoiding favoritism. A judge shall not appoint or vote for the appointment of any person as a member of his staff or that of the court of which he is a member, or as an appointee in a judicial proceeding, who is a relative within the sixth degree of relationship of either the judge or the judge’s spouse. A judge shall also refrain from recommending a relative for appointment or employment to another judge serving in the same court. He shall not approve compensation of appointees beyond the fair value of services rendered.”
Concededly this case does not present an instance of open nepotism. The appointment of his son by any Judge would be both unthinkable and intolerable whatever might be the son’s *468 character and fitness or his father’s peculiar qualification in the circumstances to assess such character and fitness. The enlarged evil in this instance is that an arrangement for cross appointments would not only offend the antinepotism principle; it would go a step further, seeking to accomplish the objectives of nepotism while obscuring the fact thereof.
We address then the circumstance that both the Referee and the commission have concluded that in this instance there was in fact no quid pro quo impropriety in the appointments made by petitioner. Both have also determined, however — and this, of course, is the predicate for the disciplinary action taken — that petitioner’s participation in the pattern of cross appointments gave an appearance of impropriety, in effect permitting the inference that each of the Judges involved was by this means securing appointments for his own son. Additionally, the commission observed that petitioner might be perceived as having resorted to this device to avoid a charge of nepotism. Here, too, the articulation of the canons has been clear and undeviating. When first adopted in 1924 the Canons of Judicial Ethics likewise proscribed the appearance of impropriety. Canon 4 provided: "A judge’s official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life should be beyond reproach.” Canon 2 of the present Code of Judicial Conduct states the continuing principle succinctly: "A judge should avoid impropriety and the appearance of impropriety in all his activities.” Similarly, section 33.2 of the Rules Governing Judicial Conduct must be read to condemn the appearance as well as the fact of impropriety (22 NYCRR 33.2).
Reluctance to impose a sanction in this case would be taken as reflecting an attitude of tolerance of judicial misconduct which is all too often popularly attributed to the judiciary. To characterize the canonical injunction against the appearance of impropriety as involving a concern with what could be a very subjective and often faulty public perception would be to fail to comprehend the principle. The community, and surely the Judges themselves, are entitled to insist on a more demanding standard. As Chief Judge Cardozo wrote in Meinhard v Salmon (249 NY 458, 464): "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensi *469 tive, is then the standard of behavior”. And there is no higher order of fiduciary responsibility than that assumed by a Judge. It would ill befit the courts and the members of the judiciary to suggest that Judges are to be measured against no higher norm of conduct than may at times and in some places unhappily have been perceived as reflecting the mores of a judicial marketplace. Petitioner in this case makes no plea to be measured by any such coarse or mean yardstick. To suggest, as does the dissenter, that there has been a modus operandi which has condoned the making of appointments subject to the personal preferences of the appointing Judge (pp 470-471) affords no proper ground on which to excuse the present conduct. To the extent that such a practice may have existed in certain areas, it has been aberrant; certainly it has had the support and approval only of its practitioners.
In the present case the fact that cross appointments were knowingly made by petitioner during the period in question is not disputed. Notwithstanding the absence of proof of any actual or intended impropriety there was thereby inescapably created a circumstantial appearance of impropriety.
While petitioner’s personal relationship with the appointees may indeed have enabled him better to evaluate their qualifications, we do not subscribe to the view expressed by the dissenting members of the commission that, if the appointee is otherwise fully qualified to receive the appointment, his filial relationship with another member of the judiciary can be ignored. It may be that, in special circumstances where the appointee is uniquely qualified and the appointment is openly made with the consent of the parties or such consent is withheld for mere tactical partisan advantage or other insufficient reason, an otherwise disabling relationship between the appointing Judge and the appointee may not preclude appointment. But this is not that case. Nor do we accept the dissenters’ conclusion that the cross appointments here may be overlooked as de minimis in view of the "thousands of appointments made by the petitioner during his judicial service” and his extended record of public service. Finally, we perceive no proper basis for giving prospective effect only to condemnation of the appearance of impropriety created by cross appointments as was further suggested by one of the dissenting members of the commission.
It remains to make one additional observation. We think it entirely improper on the part of the administrator, on argu *470 ment of the motions addressed to the Referee’s report in connection with the commission’s consideration of the sanction to be imposed, to have introduced evidence of additional, alleged misconduct on the part of petitioner. The subject matter of these supplemental allegations had not been included in the charges or raised before the Referee. It is irrelevant that the administrator claims to have given petitioner’s counsel advance notice of his intention to refer to this impertinent material. Unproved charges, for which there was no basis in the record, had no place in the commission’s consideration as to the sanction appropriately to be imposed on the predicate of its findings of fact and conclusions of law drawn from the proof in the record. In all the circumstances we are satisfied, however, that the erroneous references to this extraneous material did not affect the determination made by the commission.
Accordingly, we accept the determination of the commission that petitioner be admonished.

. We observe that the commission did not discretely identify its findings of fact and conclusions of law as is contemplated by the statute (Judiciary Law, § 44, subd 7). Instead there is but a blanket characterization of the prose paragraphs of the determination — "The foregoing constitutes the findings of fact and conclusions of law required by Judiciary Law, § 44, subdivision 7.” Additionally, the cryptic statement, "Insofar as they are not inconsistent with the foregoing, the Commission accepts the findings of fact set forth in the Referee’s report”, although suggesting departure to some extent from the findings made by the Referee, is ambiguous and fails to reveal in what respect the commission differed with the Referee. In another case the failure of the commission to follow the procedure contemplated by the statute might significantly impair our review of the commission’s action.
We also take note that the documents by which petitioner was notified of the determination of the commission and his request for review by the Court of Appeals are a part of the record in this proceeding.

. Nepotism was a custom in the Han dynasty (4 Encyclopedia Brittannica, 310b) and often respected in the philosophies of the Middle East as reflecting a praiseworthy sense of family loyalty (16 Collier’s Encyclopedia, 162 d). In the western world, however, where it came to prominence as a practice of papal authority commencing with Pope Adrian I in the eighth century and reached its zenith during the Renaissance, it was repeatedly condemned (e.g., Dante, Inferno, 19.31, 19.52-81, 27.85-129; Petrarch, Epistulae sine nomine 11, ed P Piur, Petrarcas Buch ohne Ñamen und die pfipstliche Kurie [Halle, 1925]; G. H. Hist Cardinals II, 1.116 [1670] — "Ministers that buy the favour of the Nepotisme, do revive * * * a new Neronisme of Tyranny”). The *467 church itself ultimately took steps to impede it through papal bull (Pope Pius V Admonet nos [1567]) and constitution (Romanum decet pontificem [1692]). More generally, it has been regarded as a form of misuse of authority, associated with corruption (11 International Encyclopedia of Social Sciences, 275).

. (Forty-Seventh Annual Meeting of the American Bar Association, Philadelphia, Pennsylvania, July 9, 1924 [49 ABA Reports 764].)