Fuchsberg, J.
(dissenting in part). As the majority points out, no charges have been leveled against the Surrogate. Rather, what we have before us are no more than proceedings incident to an investigation, however initiated, under the omnibus power the commission has been granted to look into complaints (NY Const, art VI, § 22, subd a).
Nevertheless, and mindful though I am of our practice of refusing to issue advisory opinions in ordinary appeals, because this court is uniquely possessed of plenary powers in such matters (Matter of Spector v State Comm. on Judicial Conduct, 47 NY2d 462) and also is charged with the extraordinary responsibility for the approval of rules of conduct governing the Judges of this State (NY Const, art VI, § 20, subd b), I would have preferred that we express our views, even at this early stage, on at least two subjects, one substantive in nature and the other procedural. In doing so, I also cannot help but *614 reflect that appropriate guidance at this point might make it unnecessary to ever have to deal with the at best difficult balance called for when we are forced to choose between the State’s interest in policing the conduct of its Judges, on the one hand, and the exercise of the fundamental First Amendment privileges of political expression and association, on the other.
The first of these would treat with Canon 7 (subd B, par [2]) of the Code of Judicial Conduct. Involved to a greater or lesser extent in each of the three items which are the subject matter of the commission’s inquiry, it reads: "A candidate, including an incumbent judge, for a judicial office that is filled by public election between competing candidates should not himself solicit or accept campaign funds, or solicit publicly stated support, but he may establish committees of responsible persons to secure and manage the expenditure of funds for his campaign and to obtain public statements of support for his candidacy.”
It must be remembered that the Surrogate originally was an independent candidate for election to the office she now holds. It is argued that, absent the support of political machinery or the possession of personal wealth, the opportunity and means of making one’s view and virtues known to the electorate in heavily populated New York City may be insuperable without the financial and personal aid of others.
Whatever be the relative merits of the elective versus the appointive method for selecting of Judges — and our Nation’s history shows there have been times when we have tired of each — the fact is the elective system was then, as it is now, the one mandated for this office by our State Constitution. Unless a means test or an alternative means to finance election campaigns is devised and adopted, it seems obvious then that serious questions must arise. For, like it or not, realistically, if not constitutionally, this impediment to a candidate’s right to "speak” and to the concomitant public right to "hear” could very well impose "substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression” (Buckley v Valeo, 424 US 1, 58-59). It may even take the strict scrutiny test beyond its outer limits.
It is interesting therefore to note that the commission, whose task it is to enforce rather then create our codes of judicial ethics, with commendable candor, has had occasion to *615 report: "The intent behind keeping a judge from knowing his contributors is obvious: to avoid the impression that, if elected, the judge will administer his office with a bias toward those who supported his candidacy. The requirement of public filing practically defeats that intent. So does the fact that a candidate who runs for judicial office chooses his treasurer and those who will be instrumental in raising funds on his behalf. It is unrealistic to expect that a political figure seeking any office would not know the names of at least his most generous contributors. A judge should have access to his list of contributors and should take steps to insure that he does not violate any of the specific standards or the rule against appearances of impropriety.” (NY State Comm on Judicial Conduct, Ann Rep, Jan. 1978, at pp 63-64).
I turn now briefly to a second matter, the vagueness, indeed absence, of any significant detail that would cast meaningful light on the substance of the inquiry. Granted that, on its face, this may be no more than the summary language of the Constitution commands at this stage, fairness would seem to dictate that in an ethical inquiry in which the target, rightfully, is to be held to the highest standard of conduct, where the subject matter is almost sure to partake of the subtle and the sensitive, and where the preferred outcome is an early and adequate explanation, the Judge who is its object should not be kept in the dark.
Finally, fairness again, it seems to me, requires that since "appearances” more often are the product of the publicity rather than that of the underlying conduct, a Judge should not have to pay the price of privacy for the privilege of pursuing her rights.