OPINION OF THE COURT

Per Curiam.

In this proceeding to review a determination of the State Commission on Judicial Conduct, we are called upon to consider whether the conduct of petitioner, a Judge of the New York City Civil Court, constituted a serious breach of judicial ethics warranting the imposition of the extreme sanction of removal from office. After having reviewed all of the evidence before the commission, we conclude that removal is appropriate.
The essential facts are not disputed. Petitioner took office in January of 1970. Within six months, he was approached by two friends, Jerome Silverman and Toshi Miyazaki, and asked if he would assist in arranging a substantial loan for Miyazaki’s travel business. Petitioner assented and promptly contacted a prospective lender named Ditkowich, who had previously loaned money to Miyazaki at petitioner’s request. Upon petitioner’s urging, Ditkowich agreed to lend Miyazaki $90,000 at a total annual interest rate of 24%, which rate included a *78 3% fee to compensate petitioner for his efforts in "servicing” the loan on an ongoing basis.[1]
Pursuant to the understanding of the parties, petitioner personally collected the loan payments each month from Miyazaki and, after subtracting his share of the interest, forwarded the remainder to Ditkowich. Although petitioner ordinarily picked up the money from Miyazaki at the latter’s place of business, there were occasions when the payments were either picked up by Vincent Pizzuto, petitioner’s law *79 assistant, or delivered by Mrs. Miyazaki to petitioner’s chambers.
A similar arrangement was made in 1971, when Miyazaki approached petitioner with the plaint that he needed more money for his cash-hungry business. This time, petitioner arranged a $5,000 loan in which his dentist, Dr. Bukantz, acted as lender. The interest rate on this loan was also 27%, with 18% going to the lender and 9% going to petitioner for his ongoing role in collecting the payments.
Between 1970 and 1973, petitioner participated in a number of other transactions similar to the Miyazaki loans. The most significant of these was a loan of $10,000 made by one David Gilman to a Mr. Stein, the president of Merrick Harbor Drug Co., at an interest rate of 24% per year, of which petitioner was to receive half. As was his practice with respect to the other loans, petitioner would routinely collect the loan payments from the borrower at the borrower’s place of business. < In making the collections on the Gilman-Merrick Harbor Drug loan, however, petitioner consistently identified himself to the borrower as "Vincent Pizzuto”, using that name when he signed the receipts for the cash payments. Although petitioner testified before the commission that he concealed his true identity from Stein, the borrower, because he was "ashamed” to let Stein know that a Judge was acting as "a sort of messenger boy” who was "running back and forth handling this type of thing”, he offered no explanation as to why he continued to sign the receipts with his law assistant’s name after his identity had accidentally been made known to Stein.
In addition to the evidence concerning petitioner’s activities as a loan broker, the commission also considered petitioner’s dealings with the Internal Revenue Service during his early years on the Bench. It was conceded before the commission that petitioner failed to report a total of $3,203 of the income from his loan business on his Federal tax returns for 1971, 1972 and 1973. A $5,545 "forwarding fee” which was "earned” by petitioner while he was still a practicing attorney, also was omitted from his 1971 return. Finally, on his returns for 1971 and 1972, petitioner took "medical and dental expense” deductions for payments he made by check to Dr. Bukantz, although these payments actually represented transfers of funds paid to petitioner by Miyazaki toward the latter’s loan obligations.
On the basis of the foregoing facts, the Commission on *80 Judicial Conduct determined that petitioner had engaged in a continuing course of conduct which cast his fitness to serve as a Judge in serious doubt and that, accordingly, he should be removed from the Bench. We agree.
The ethical mandates governing the conduct of Judges on and off the Bench have long cautioned against personal business practices which would create an appearance of impropriety and impugn the integrity of the judicial office (see Canon 2, subd A, Code of Judicial Conduct, reprinted in McKinney’s Cons Laws of NY, Book 29, p 518; Canon 4, Canons of Judicial Ethics, reprinted in McKinney’s Cons Laws of NY, Book 29, p 425 [1968 ed]). Specifically, Canon 25 of the Canons of Judicial Ethics, which constituted the governing ethical code at the time petitioner took office, provided: "A judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute * * * to the success of private business ventures * * *. He should, therefore, not enter into such private business, or pursue such a course of conduct, as would justify such suspicion, nor use the power of his office or the influence of his name to promote the business interests of others * * * nor should he enter into any business relation which, in the normal course of events reasonably to be expected, might bring his personal interest into conflict with the impartial performance of his official duties” (see, also, Canon 5, subd C, Code of Judicial Conduct, supra, pp 526-527).
While there may have been some uncertainty concerning the outer limits of this prohibition,[2] petitioner cannot take refuge in any such uncertainty, since his private business activities fell squarely within the type of conduct that Canon *81 25 clearly and unambiguously proscribes. Whether or not petitioner deliberately and overtly used the prestige and authority of his office to persuade the lenders and borrowers in this case to enter into the transactions from which he personally profited, it cannot be doubted that his conduct created the appearance that such was indeed the case. Contrary to petitioner’s assertions, a Judge cannot simply cordon off his public role from his private life and assume safely that the former will have no impact upon the latter (see Matter of Kuehnel v State Comm. on Judicial Conduct, 49 NY2d 465, 469). Wherever he travels, a Judge carries the mantle of his esteemed office with him, and, consequently, he must always be sensitive to the fact that members of the public, including some of his friends, will regard his words and actions with heightened deference simply because he is a Judge. It takes little imagination to visualize the persuasive and perhaps even subtly coercive effect that occurs when a Judge solicits an unsecured loan for a friend and backs up his request with his personal guarantee. Similarly, can there be any serious doubt that a borrower would be hesitant to protest a seemingly high and perhaps even illegal interest rate when the person collecting the loan payments is a Judge with all of the power and prestige that that title implies?
We stress that in this case, the inevitable danger of subtle persuasion which might naturally arise from petitioner’s title was aggravated by petitioner’s occasional use of his chambers to conduct his loan business and by his utilization of a judicial employee in several instances to collect the loan payments. Far from indicating that petitioner took scrupulous care to separate his personal business from his public duties, these incidents are illustrative of an unacceptably careless attitude toward the obligations and privileges of his judicial office and a lack of sensitivity to the dangers inherent in their abuse.
Lest it be said that we are approving the imposition of the ultimate sanction of removal for what might be characterized as extremely poor judgment, we hasten to note that this is not just a case of simple careless inattention to the applicable ethical standards. The commission specifically found that petitioner intentionally misrepresented his income and allowable deductions on his Federal income tax returns. Although petitioner now contends that these errors on his tax returns were inadvertent, his protests lack the ring of truth. Having examined all of the relevant testimony on this point (see *82 Matter of Spector v State Comm. on Judicial Conduct, 47 NY2d 462, 465-466, supra), we conclude that the commission’s finding of deliberate falsification was correct.[3] Moreover, we cannot overlook the fact that petitioner attempted to conceal his true identity from the borrower in the Gilman-Merrick Harbor transaction. While he asserts that he did so only out of an acute sense of "embarrassment”, his continued and unexplained use of a pseudonym for purposes of signing receipts long after his identity was disclosed suggests an ongoing, albeit somewhat clumsy, effort to conceal his business activities from official scrutiny.[4]
In summary, we find that petitioner’s conduct of the described financial affairs in utter disregard of the Canons of Judicial Ethics requires acceptance of the sanction of removal from judicial office.
Implicit in our holding is a rejection of the novel interpretation petitioner has asked us to place upon the relatively new constitutional provisions governing the removal of Judges from office. Our State Constitution now provides that Judges may be removed "for cause, including, but not limited to, misconduct in office, persistent failure to perform [their] duties, habitual intemperance, and conduct, on or off the bench, prejudicial to the administration of justice” (NY Const, art VI, *83 § 22, subd a). Petitioner contends that violations of the canons and regulations governing judicial conduct cannot form the predicates for disciplinary action and that the foregoing constitutional provision provides the sole standard for imposing disciplinary sanctions upon the Judges of our State. This contention, however, represents a fundamental misunderstanding of the relationship between the constitutional provision and the various canons and regulations governing judicial conduct.
It is the constitutional provision that provides the basic authority for imposing disciplinary sanctions, including removal, upon Judges "for cause”. In addition, the new constitutional provision contains some specific examples of the types of conduct that would constitute grounds for the imposition of such sanctions. But the list of offenses specified in section 22 (subd a) of article VI is not an exclusive list; indeed, as is made clear by the language of that provision, the "causes” for which a Judge may be admonished, censured or removed are "not limited to” those described therein. This is precisely where the various prescriptive canons and regulations (see Rules Governing Judicial Conduct, 22 NYCRR 33.1-33.7; Code of Judicial Conduct, reprinted in McKinney’s Cons Laws of NY, Book 29, pp 517-540) come into play. These canons and regulations, along with " 'the general moral and ethical standards expected of judicial officers by the community’ ” infuse added meaning into the sparse statutory term "for cause” and provide guidelines for the commission and this court to use in determining when and to what extent a sanction should be imposed (Friedman v State of New York, 24 NY2d 528, 539-540, quoting Sarisohn v Appellate Div., Second Dept., Supreme Ct. of State of N. Y., 265 F Supp 455, 458; see, also, People v La Carrubba, 46 NY2d 658, 663-664; Matter of Owen, 47 NY2d M).
 We agree in principle with petitioner’s contention that the extreme sanction of removal should not be imposed absent truly egregious circumstances. But we cannot accept his further contention that conduct off the Bench may give rise to removal only where there has been some act of overt illegality or extreme "moral turpitude”. We see no sound reason to distinguish between conduct "on the Bench” and conduct "off the Bench” for present purposes, since "[a]ny conduct, on or off the Bench, inconsistent with proper judicial demeanor subjects the judiciary as a whole to disrespect and impairs the *84 usefulness of the individual Judge to carry out his or her constitutionally mandated function” (Matter of Kuehnel v State Comm, on Judicial Conduct, 49 NY2d 465, 469, supra; see Matter of Pfingst, 33 NY2d [ii], [kk]). Here, we have found that petitioner’s complete insensitivity to the special ethical obligations of Judges rendered him unfit for judicial service. Mindful that "[t]he place of justice is a hallowed place; and therefore not only the Bench but the foot pace and precincts and purprise thereof ought to be preserved without scandal and corruption” (Bacon, Of Judicature, reprinted in American Judicature Society, Handbook for Judges, pp 25-29 [1961]), we cannot and will not shrink from our constitutional obligation to preserve the integrity of the judiciary by removing petitioner from office.
For the foregoing reasons, the determined sanction of removal should be accepted, without costs.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Meyer concur in Per Curiam opinion.
Determined sanction accepted, without costs, and Jerome L. Steinberg is removed from his office of Judge of the Civil Court of the City of New York.

. Of the remaining 21%, Ditkowich was to receive 18% and Silverman, who was an accountant, was to receive 3% for monitoring Miyazaki’s accounts receivable and reporting on them to the lender. A short time after the loan was consummated, however, Ditkowich became dissatisfied with the return he was receiving on his investment, and, consequently, the total annual interest rate was increased to 27%, out of which Ditkowich was to receive 24% and petitioner was to receive 3%. Silverman dropped out of the transaction at this point and relinquished his share of the interest payments.
Although it is a crime under the Penal Law to charge more than 25% per annum interest (Penal Law, § 190.40), the Commission on Judicial Conduct stopped short of finding that petitioner had been guilty of participating in a criminally usurious transaction, because the "[requisite elements of intent and collateral circumstances were not developed [on the record]”. The testimony on the record does establish, however, that petitioner had been informed by his law assistant, who drafted the loan documents, that the law prohibits interest rates in excess of 25%. Additionally, there was testimony on the record, which was credited by the referee, indicating that, after the Miyazaki loan had been paid off, petitioner became "quite concerned about the extra percentage” when he learned that his financial activities were the subject of a Grand Jury investigation. According to this testimony, petitioner met with Miyazaki shortly before the latter was to testify before the Grand Jury and asked if there was "any way of not showing” the extra 3% per annum interest charge. Miyazaki apparently refused to accede to this request. Nevertheless, in a subsequent meeting between the two men, according to the testimony, petitioner again demonstrated concern for his own legal liabilities by asking Miyazaki to sign an affidavit attesting to the fact that the gross interest rate was only 24% and that the remaining 3% was understood to be a "service charge”. Once again, Miyazaki refused to co-operate.
Although the charges made in connection with these incidents were ultimately dismissed by the.commission without comment, the underlying testimony does serve to indicate that petitioner was conscious of the potential legal ramifications of his actions and that, rather than attempting to rectify the situation, he made a concerted effort to conceal the true facts in the face of a Grand Jury investigation. Needless to say, such conduct is totally unacceptable, for a Judge is, of course, sworn to uphold the truth-seeking process.
That the charges of misconduct associated with the above-mentioned testimonial evidence were not sustained by the commission does not vitiate our conclusion. As we noted in Matter of Spector v State Comm. on Judicial Conduct (47 NY2d 462, 465-466) and Matter of Dixon v State Comm. (47 NY2d 523, 525), this court is empowered to review the commission’s "findings of fact and conclusions of law” in these proceedings (NY Const, art VI, § 22, subd d). Having reviewed all of the evidence before the commission in this case, we are satisfied that the testimony credited by the referee accurately portrayed the events in question.

. Any uncertainty concerning the range of business activities that are forbidden to full-time Judges was eliminated with the promulgation of section 33.5 (subd [c], par [2]) of the Rules Governing Judicial Conduct (22 NYCRR 33.5 [c] [2]). This regulation provides: "No judge or justice of the Court of Appeals, Appellate Division, Supreme Court, Court of Claims, County Court, Surrogate’s Court, Family Court, District Court, Civil Court of the City of New York, or Criminal Court of the City of New York shall be a managing or active participant in any form of business enterprise organized for profit”.
We have no occasion to consider whether petitioner’s conduct, which occurred before section 33.5 (subd [c], par [2]) was promulgated, may be measured retroactively by the specific standard articulated in that provision (cf. Matter of Spector v State Comm. on Judicial Conduct, 47 NY2d 462, 469, supra), since we conclude that the conduct in question fell squarely within the long-standing prohibitions contained in Canon 25 of the Canons of Judicial Ethics.

. Petitioner has also argued that the commission’s findings of fact on this and other issues should be rejected because the commission routinely uses the "preponderance of the evidence” standard in making its factual determinations (see 22 NYCRR 7000.6 [h]), although, in his view, the higher standard of proof by "clear and convincing evidence” is required. We note, however, that a resolution of this important legal question is unnecessary here, since, in petitioner’s case, the referee who initially heard the case expressly adopted the "clear and convincing evidence” standard at petitioner’s request, and the commission’s formal factual conclusions coincided in almost all respects with those of the referee. Moreover, our own analysis of the evidence satisfies us that the commission’s factual findings were supported by "clear and convincing evidence”. Thus, we do not deem it necessary to consider whether a disciplinary sanction may be imposed upon a Judge on the basis of a lesser standard of proof.

. The only outstanding documents or records which contained petitioner’s name and which could serve to link him directly to any of the loan transactions were the checks he drew on his own bank account to pay Dr. Bukantz his share of the proceeds from the Miyazaki loan. These checks, as noted above, were later identified on petitioner’s tax return as payments to Dr. Bukantz for his professional services. The other papers which contained petitioner’s name were all retained by him. By signing his law secretary’s name to the receipts he was required to give to Merrick Harbor Drug Co. in exchange for its cash payments, petitioner was able to avoid having his own name appear on the only documents that were to remain in the hands of a relative stranger.