Fuchsberg, J.
(dissenting). It is a source of regret that I find it necessary to state my strong objection to the catastrophic consequences which the majority so sweepingly visits on the respondent.
Not a single one of those who officially have participated in the investigations and determinations, or in the personal confrontations on which they were based, expressed the opinion that the nature of respondent’s improprieties war *405 ranted the judicial beheading ordered today. For instance, the counsel who, exhaustively and meticulously, presented the case on behalf of the Commission on Judicial Conduct summed up his conclusions in this way: “I regard the respondent, and I say this as an adversary to the Commission, as a person of integrity. His testimony was credible from the very beginning of this case. He cooperated; he told the truth. I think that removal from office would be too harsh a penalty”.
So too all 11 members of the commission, each a distinguished jurist, lawyer or layperson, and each experienced in hearing and deciding such matters, voted, without exception, that the appropriate punishment be public censure. Consonantly, the respondent having elected to appeal to this court, the brief filed by the commission’s administrator recommends that we accept the sanction. And, as to the majority’s concern that the respondent is not contrite enough, the record shows that he has avowed that, “In the future I will not do it”. More mea culpas would serve no purpose.
In passing on the sanction, it cannot be unimportant that there is here not even a suggestion that the acts on which these charges were based in any way or at any time interfered with the proper conduct of Judge Shilling’s judicial duties. Nor is the unexampled and impressive demonstration of support by the host of 56 character witnesses, most of whom are Judges and one of whom is the Administrative Judge of the very court on which he serves, to be blithely cast aside. It certifies to the respect he has earned for his judicial deportment among those in whose midst he must carry out his public responsibilities day in and day out.[1]
What is involved here essentially is overzealous conduct on behalf of an eleemosynary institution which, in the respondent’s private life, he had long served as a devoted *406 trustee. This organization, the Association of Humane Societies of New Jersey, is dedicated to animal welfare. Without gainsaying the lack of sensitivity with which it has been found that the respondent functioned on its behalf on the occasions which precipitated this proceeding, it would seem that a proper balance demands equal acknowledgement that the criticizable conduct was not motivated by venality or personal gain or any other mean, selfish or dishonorable impulse.
There was nothing wrong per se in the respondent’s participation in the society’s affairs. Jurists do not have to sit in isolated, cloistered, legal splendor, completely detached from responsibilities to the community at large. True, there are boundaries that must be respected, but they are free to live normal lives and to identify themselves with or engage in charitable activities. In fact, the Code of Judicial Conduct (Canon 5, subd B) expressly permits them to hold officerships and directorships in educational, religious, charitable, fraternal and civic organizations, so long as these activities are not conducted for the economic and political advantage of their members and so long as they do not detract from either the dignity or the performance of judicial office.
It is against this background that we now turn to the misguided conduct out of which this case arose. It started when the Humane Society decided to enlarge the geographical scope of its operations by establishing an animal shelter in Brooklyn. This brought on a flood of licensing, zoning and other objections from the American Society for the Prevention of Cruelty to Animals (ASPCA) and the New York City Department of Health. The Humane Society, justly or unjustly, was convinced that the objections were meritless and had been fueled by reluctance on the part of the ASPCA, which enjoys limited law enforcement powers in New York City, to abide the intrusion of the New Jersey agency. Be that as it may, when the grant of the license had been delayed inordinately and the ASPCA had issued several summonses against the Humane Society and John Esteves, the employee in charge of its newly opened Brooklyn facility, it turned to Judge Shilling. As the Humane *407 Society trustee who resided in Brooklyn, he was asked to and, undisputably, though very unwisely, did undertake to communicate with the ASPCA and the health department to try to persuade them to cease what he and his colleagues at the society perceived to be an attempt to destroy the society’s newborn project. Initially, this took the form of the telephone calls to which the majority alludes, and, later, at the behest of the society’s counsel, to his attendance in court, where he was asked to be available, on behalf of the society, to approve any agreement that might be arrived at between the parties at a conference expected to be held there that day.
There appears to be little question but that the respondent, moved by an obvious passion for the society’s cause, waxed indignant about what he and his colleagues conceived to be the unfair exclusionary tactics of those in opposition to its Brooklyn inroads, and that, at times, the depth of his irritation, perhaps with some unconscious loss of control and dignity, came through in angry tones. And, in one telephone conversation, he did use an expletive which, while not acceptable in the “polite society” of a by-gone age, regrettably is no longer an uncommon feature of private parlance in the world of today. In the course of the conversations, he suggested that, if the ASPCA were intent on pressing the court proceedings it had started, these could just as well be tested against the society without involving the employee as an individual.[2]
In the courthouse episode, though it was indiscreet for him to be there at all, the fact is that the respondent sat mutely in the back of the room until the conference was concluded, never speaking to the Judge, who in any event was not expected to have any continuing connection with the matter, until the meeting was over. After the court recessed, the parties and their attorneys were already engaged in a heated corridor discussion when the respondent, having approached the group to.offer some information on *408 the zoning question and having received a rejoinder that appeared to challenge his credibility, proudly responded, “I am a Judge of the City Court. I don’t lie. When I state a fact, it is a fact”.
Now, it would seem that altogether too much has been made of the fact that the respondent introduced himself as “Judge” Shilling when he had the telephone conversations. It is clear that, if anything, the relevant association that was stressed was, in the words of a communicant called by the commission, “the Judge Shilling who was involved with the AHS”. Titular identification of Judges, even after they no longer hold judicial office, is the accepted practice. Former Judges are usually so addressed when they appear in court as lawyers. It would be unreal then, to expect that Judges (or for that matter, clergymen, physicians, professors or doctors of philosophy), just because they may find themselves addressing people with whom they have a difference of opinion in private matters, should be required to move about with a cloak of anonymity. The important thing, of course, is that a Judge should conduct himself, off or on the Bench, in a manner respectful of the title he or she bears.
Now, we must not lose sight of the fact that, no matter how we subdivide it into its details, overall this case involves only one situation, the controversy between the Humane Society and the ASPCA, in which, the respondent, for idealistic and humane reasons, foolishly permitted himself to be swallowed up. Withal, he insists that he never intended to exert the influence of his office. This must be accepted for, whatever may be said about his judgment or the care with which he expressed himself in this instance, one thing that appears established, and confirmed, is his principled veracity.
Corroborative is the fact that, though some may have formed the impression that he intended to exert influence on behalf of the Humane Society, there is nothing at all to indicate that he ever tried to do so. The threat, indeed, may have been largely within the minds of the witnesses as a reaction to the vigor and vehemence of his repeated requests on behalf of the society. While the Judge should have been *409 mindful that there could be such reaction and controlled his conduct accordingly, in the circumstances here I cannot accept judicial action, which, repudiating the commission’s determination, insists on a result that not even a post-Watergate public image syndrome would justify.[3] The sanction voted by the Commission on Judicial Conduct should be accepted.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur in Per Curiam opinion; Judge Fuchsberg dissents and votes to accept the determined sanction in a separate opinion.
Determined sanction rejected, without costs, the sanction of removal imposed and Norman H. Shilling removed from his office of Judge of the Civil Court of the City of New York, effective at midnight December 31, 1980, and, during the period between the date of service upon him of *410 a copy of the order to be entered herein and December 31, 1980, he is suspended, with.pay, from office except to the extent necessary to complete matters begun but not completed by him at the time of such service.

. These appraisals were in the face of the private admonition he had once received some years earlier for courtroom use of “inappropriate” language, a circumstance that appears never to have repeated itself. As the unimpeached judicial testimony indicates, a sense of perspective requires us to also note that the sundial that marked this single blemish did not record the impartiality, industry, wisdom and otherwise excellent temperament that characterized Judge Shilling’s judicial performance.

. It is interesting to note, for whatever it is worth in these proceedings, that ultimately the license was granted and the summonses against the employee in the main were dismissed.

. Since none of the three disciplinary cases cited by the Per Curiam (Matter of Lonschein, 50 NY2d 569; Matter of Kuehnel, 49 NY2d 465; Matter of Steinberg, 51 NY2d 74) would justify the drastic disposition in the present case, I append the following comments on each:
In Lonschein (pp 571, 572), the respondent had intervened in two nonjudicial matters, one on behalf of a close personal friend who had encountered difficulties with various New York City administrative agencies from whom he was seeking to obtain a lease to a car service base station, the other by communicating with a deputy counsel of the City Taxi and Limousine Commission to urge the removal of “various impediments * * * thwarting approval” of a “lucrative contract”. The determination of the commission was that the Judge be censured on each. This court rejected the determined sanction as excessive on the one charge and, though it found that “petitioner was aware that his judicial position would affect the subsequent conduct of the * * * counsel” and nevertheless “placed the prestige of his office behind the request”, it reduced the sanction on the second to admonishment.
In Kuehnel (p 469), where the commission’s recommendation of removal was accepted by the court, the respondent, inter alia, after detaining four youths without cause, engaged in “two frenzied displays of overt physical violence” towards young boys, engaged in “repeated outbursts * * * [of] virulent racism”, displayed “at the very least a gross lack of candor” before the officer who heard the charges. There can be no comparison between this case and that of Judge Shilling.
In Steinberg, where the commission’s recommendation of removal was accepted by the court, the respondent was found, inter alia, for years to have been using his chambers to conduct a loan brokerage business, had utilized a judicial employee to collect his loan payments and had deliberately falsified his income tax returns. Again, there can be no comparison between this case and that of Judge Shilling.