Titone, J.
(dissenting). By accepting without qualification the harsh sanction of removal for Judge Duckman’s indiscretions, the majority has sent a message that the State’s judicial disciplinary procedures are susceptible to manipulation by public officials and that Judges whose rulings displease those public officials may find themselves singled out for exceptional, and possibly ruinous, scrutiny. Because the outcome in this case strikes at the heart of the notion of judicial independence which is so critical to our tripartite system of government, I feel compelled to express my dissenting views.
The instant disciplinary proceeding did not begin in a vacuum, and its outcome cannot be assessed without reference to the political maelstrom that generated it. It is clear from the public record that petitioner was targeted for investigation and formal discipline because of the publicity he received in connection with a routine bail decision he made in a misdemeanor prosecution involving one Benito Oliver. Some three weeks after his release on bail, Oliver located his former girlfriend, *158 Galina Komar, shooting her and then himself. The following day, the incident was reported by the New York City tabloids in sensational headlines which implied that petitioner was somehow to blame for the tragic incident. One tabloid blared a headline indicating that petitioner had said “[e]ven I beat my wife” — a remark that he never actually made.
The lurid newspaper coverage was followed only a few days later by a letter from the State Senate Majority Leader to the State Commission on Judicial Conduct demanding that petitioner’s fitness be investigated immediately. At the same time, Governor Pataki initiated his own “investigation” of petitioner. These actions by two of the State’s most powerful elected officials were part of a larger political climate in which Judges were increasingly being scapegoated. Beginning around the time of the Komar killing and continuing throughout the spring and fall of 1996, journalists specializing in sensational reportage and politicians anxioús to capitalize on public fear combined to lay the blame for urban crime at the feet of “criminal coddling” Judges (see generally, Goshko, Accusations of Coddling Criminals Aimed at Two Judges in New York, Wash Post, Mar. 14, 1996, at A3; Olch, Soft on Crime? Not the New York Court of Appeals, NYLJ, May 6, 1996, at 1, col 1; Reske, ABA Commission Defines Areas of Judicial Independence, 82 [Dec. 1996] ABA J, 99; Reske, Pointed Resignation Judge Blasts Politicization of Judiciary, 82 [July 1996] ABA J, 40; Seymour, Jr., Defending the Judiciary — An Open Letter to the Bar, 38 [No. 2] NY St Bar Assn — St Bar News, at 1, col 2 [Mar./Apr. 1996]; Spencer, Protection Order Abuse Elevated to Felony, NYLJ, Aug. 9, 1996, at 1, col 3).
As the onslaught from the media continued, the Governor’s office sent representatives to the Kings and Bronx County District Attorneys offices, apparently to obtain additional negative background material on Judge Duckman. These representatives were given access to one or more files containing transcripts of proceedings before Judge Duckman, which appear to have been ordered and preserved for some unspecified future use. Notably, some of these transcripts involving dismissed criminal charges were shown to the Governor’s investigators without regard to the confidentiality rules that apply to sealed records (see, CPL 160.50). Having collected a list of complaints from trial assistants about petitioner’s handling of their cases and his mistreatment of individual prosecutors, the investigators compiled a nine-page report that *159 was ultimately forwarded to the Judicial Conduct Commission.[1]
On February 28, just two weeks after the Komar killing, the Governor made a highly publicized demand that the Judge who released the killer be suspended and that formal disciplinary proceedings against him be commenced. This demand was accompanied by an ultimatum, announced at a gubernatorial press conference, that the Commission must either remove petitioner from office within 60 days or the Governor would initiate impeachment proceedings before the State Senate (see, NY Const, art VI, § 23 [b]).
On April 22nd, just a few days shy of the Governor’s deadline, the Commission acted by announcing the filing of formal charges against petitioner. None of the charges were based on petitioner’s bail decision in the Oliver case. Instead, the charges in question were cobbled together from a handful of incidents selectively drawn from tens of thousands of cases petitioner handled during his five-year tenure on the criminal Bench.
The majority’s opinion details the evidence that led to the Commission’s determination that petitioner should be removed, and there is no need to repeat the substance of that evidence here. Suffice it to say that, despite the fact that some 10,000 pages of transcripts were subpoenaed and scoured for petitioner’s misdeeds, there were no clear “smoking guns”; there was only a list of petty offenses involving petitioner’s “bullying” of prosecutors, his intemperate behavior and his improper dispositions of criminal charges in some 16 cases. The latter “misconduct” was evidently motivated by petitioner’s view, expressed repeatedly on the record, that the particular prosecutions did not serve the interests of justice. Significantly, none of the 16 dismissed prosecutions in issue was deemed sufficiently important or meritorious to warrant an appeal, and none of the 19 incidents of intemperance were deemed sufficiently serious to warrant a disciplinary complaint.
What emerges from this sequence of events is a very disturbing picture. Given the timing of the investigation and the severity of the sanction imposed, the conclusion is inescapable that the Judicial Conduct Commission bowed to the Governor’s political threats and allowed itself to be used to advance the *160 agenda of the Judge baiters who were feeding off the media frenzy.
No one — including petitioner — disputes that some of the specific behavior revealed by the evidence before the Commission constitutes impropriety and may even be worthy of some sanction. The argument here is not that petitioner’s performance has been beyond reproach, but rather that he has been subjected to an extraordinary degree of microscopic scrutiny under circumstances that cannot help but serve as an object lesson to other Judges faced with the possibility of making an unpopular decision. While the existence of intemperate conduct by other judicial officers does not justify any of petitioner’s excesses, it is also true that few Judges who, like petitioner, have handled tens of thousands of cases — and sometimes as many as 100 to 200 a day — could withstand the kind of intense spotlight that has been aimed at petitioner’s record.
The implication of the present disciplinary proceeding is that Judges whose rulings displease the political powers that be may be subjected to a modern-day witch hunt in which their records are combed for indiscretions, their peccadillos strung together to make out a “substantial record” of misconduct and their judicial “sins” punished with the ultimate sanction of removal from office. Indeed, in this case, the inference that petitioner has been removed at least in part because of his interest in protecting individual defendants’ rights is reinforced by the Commission’s emphasis on his purportedly antiprosecution bias and his statements criticizing the District Attorneys’ policies. It is clearly contrary to the goal of judicial independence to suggest that a Judge may be singled out for discipline because of his or her expressed views on questions affecting the criminal justice system.[2]
Our system of laws and the public’s confidence in the judiciary rest in large measure on the notion that our Judges are *161 free to rule on the issues before them without fear of retaliatory removal. Without that freedom, there is no assurance that the choices Judges make in situations often involving unpopular alternatives have the necessary level of integrity. There are few among us who have the courage and fortitude to take judicial stands at the risk of public humiliation and loss of office. It is for that reason that our State Constitution mandates lengthy terms of office for Judges and permits removal of Judges only after impeachment by the Legislature or for grave cause after a fair adjudicative process administered by the State Commission on Judicial Conduct (NY Const, art VI, §§ 22, 23; see, Matter of Cunningham, 57 NY2d 270, 275; Matter of Steinberg, 51 NY2d 74, 81).
The perception arising from this case that the Commission is itself susceptible to political influences cannot help but undermine the confidence of the State’s Judges in these constitutional protections and chill the free exercise of their judicial discretion. A precedent has now been set in which politicians and local prosecutors have demanded the removal of a widely respected.sitting Judge for what they perceived as “criminal coddling” and have succeeded in that demand. Now that the Commission has demonstrated its willingness to be hospitable to such machinations, it seems likely, indeed inevitable, that Judges will be intimidated and will frequently be tempted to err on the side of the prosecution in debatable situations rather than risking Judge Duckman’s fate. Nothing could be more inimical to the health of our State’s system for administering criminal justice.
The record here unquestionably reveals that Judge Duck-man was occasionally guilty of intemperate conduct and that he knowingly misused his authority to terminate 16 prosecutions in order to achieve what he believed to be the ends of justice. Accordingly, since these matters were brought to the attention of the disciplinary authorities, some form of sanction should now be imposed. It seems to me, however, that Judge Duckman’s record of service as a whole does not indicate any unfitness for judicial office. To the contrary, the hearing testimony and the flood of letters that were made available to the Commission indicates that overall he has been an intelligent, hard-working, knowledgeable and compassionate jurist. Furthermore, to the extent that he demonstrated intolerance or intemperance, he did not do so out of malevolent or venal *162 motives;[3] rather, his actions were clearly motivated by compassion (see, Matter of LaBelle, 79 NY2d 350). Finally, Judge Duck-man has apologized for his excesses and has indicated that they will not occur again. Thus, there is no need to invoke the extreme sanction of removal; the lesser sanction of censure will suffice. Since the use of the removal power here not only deprives the public of a conscientious and hard-working Judge but also signals an unhealthy tolerance on the part of this Court for the heavy-handed tactics of would-be “Judge bashers,” I dissent from the Court’s acceptance of the Commission’s imposed sanction.

. The Commission subsequently obtained a judicial order directing these records be unsealed so that they could be used in evidence at the judicial conduct proceeding against Judge Duckman.

. While actual bias or even the appearance of bias is unacceptable in a Judge (see, Matter of Sardino v State Commn. on Judicial Conduct, 58 NY2d 286, 290-291; Matter of Spector v State Commn. on Judicial Conduct, 47 NY2d 462, 466), it is commonplace for Judges to express their own viewpoints during the course of the proceedings before them. For example, sentencing minutes often contain statements by Judges about the evils of crime and the impact that criminal conduct has on society. Similarly, in pretrial proceedings, Judges frequently interject their own concerns about such policy questions as “overcharging” and prosecutorial delays in processing cases. Although it would clearly be improper for a Judge to bend or stretch the law to advance his or her views on such subjects, it would unrealistic — and probably even undesirable — to require total neutrality in judicial decision-making.

. Although Judge Duckman was charged with having made offensive racist and sexist remarks, the majority has wisely eschewed reliance on that aspect of the charges, since it is apparent from the record that Judge Duck-man is not a person who harbors such biases.