Bellacosa, J.
(dissenting). I, too, respectfully disagree in this separate dissenting opinion with the Per Curiam determination to remove this Judge from his judicial office. From my personal examination of this entire record, the evidence of sustainable misconduct does not rise to the extreme level of egregiousness, demanded by this Court’s precedents, for that ultimate sanction to be imposed. Moreover, the precedential implications of this removal decision are daunting and disturbing (a) insofar as the future scope and operations of the Commission are concerned, and (b) for the future discharge of adjudicative responsibilities, especially by trial level judicial officers who have to maintain actual and perceptual independence from all outside influences.
This Court has consistently and appropriately set the bar of removal very high: it is “an extreme sanction [that] should be imposed only in the event of truly egregious circumstances” (Matter of Cunningham, 57 NY2d 270, 275; compare, Matter of Roberts, 91 NY2d 93, with Matter of Skinner, 91 NY2d 142, 144; see also, Matter of Kiley, 74 NY2d 364, 369-370; Matter of Steinberg, 51 NY2d 74, 83). Our precedents ordain that “removal should not be ordered for conduct that amounts simply to poor judgment, or even extremely poor judgment” (Matter of Cunningham, supra, 57 NY2d, at 275 [emphasis added]).
The heavily relied-on set of specifications in the instant case boils down to the overarching charge that Judge Duckman improperly handled 16 criminal proceedings: 13 dismissals for facial legal insufficiency, one dismissal in the interests of justice, and two adjournments in contemplation of dismissal. *163 The accusations are that the Judge knowingly and wrongly dismissed these cases, without notice or an opportunity for the prosecution to be heard, without allowing a chance to redraft charges, without requiring written motions, and in the case of ACDs, without the consent of the prosecutor.
These extrapolated rulings were statutorily unauthorized and irregular devices; they constitute improper means to reach debatably correct ends. While they should not be countenanced, they do not equal disciplinary misconduct at the egregious level for removal from office. They absolutely do not represent a pattern of conduct in any realistic context and appraisal of the full record of this Judge’s career. Rather, they are qualitatively and quantitatively exceptional, measured by a fair and proportional analysis of the full gamut and docket of any Judge, serving, as this Judge did, in such high volume and high intensity assignments, locales and courts. Thus, these few, never-appealed and disciplinarily resurrected remnants of cases are not so out-of-line as to justify removal of this Judge from his judicial office.
While I agree generally that this Court should resist “any numerical yardstick for determining unfitness” (Per Curiam opn, at 153-154), our precedents provide some measuring guideposts of the over-all judgmental quality and quantity necessary to elevate misconduct to a level of gravity that is required to impose the final and lifetime sanction of removal (compare, Matter of LaBelle, 79 NY2d 350 [rejecting removal where the Judge failed to set bail without legal justification in approximately 24 cases], with Matter of Sardino, 58 NY2d 286, 289-290 [upholding removal where the Judge (1) “consistently failed (in 62 cases) to inform the accused of the right to counsel and failed to conduct even a minimal inquiry to determine whether they were entitled to assigned counsel,” (2) “regularly abused his authority with respect to setting bail,” and (3) “often assumed an adversarial role at arraignments by questioning defendants”]; compare also, Matter of Skinner, 91 NY2d 142, supra [rejecting removal and imposing censure], with Matter of Roberts, 91 NY2d 93, supra [accepting removal]).
The record evidence in the instant case comes nowhere near the “distortion of the judicial function” that is reflected in Matter of Sardino (supra). This is especially so when weighed and evaluated within the precedential and judgmental universe of the multitude of other cited cases. To be sure, each disciplinary case with its sanction assessment is unique and different. Yet, the instant case fits closest to Matter of LaBelle (supra), where *164 the majority of this Court rejected the removal recommendation and imposed a serious, public censure. I consider of very high concern and weight, therefore, that the breakthrough precedent established by this case will seriously and widely expand the reasonably balanced guidance that the governing principles have ordained — up to now that is. And let no one make any mistake as to the grave, plenary responsibility invested exclusively in this Court by the State Constitution: the Commission cannot remove a Judge; only this Court can, absent impeachment.
This case also presents an additionally disturbing and distinct precedential concern in this allocation of power — i.e., that the Commission could infer that it has a new obligation and intrusive authorization to poke into the adjudicative work of Judges, legitimatized by this Court’s ultimate precedential acceptance of a determined sanction recommended by the Commission majority, insofar as it rests on these quintessentially decisional matters of dismissed cases (compare, Matter of Greenfield, 76 NY2d 293).
In Greenfield, this Court rejected the Commission’s sanction, even of censure, where the record disclosed “serious administrative failings in petitioner’s handling of the cases in issue, but no persistent or deliberate neglect of his judicial duties rising to the level of misconduct” (id., at 295). Although a Judge’s failure to promptly dispose of pending matters is generally subject to administrative correction, the Commission pushed the envelope to urge “that at some point a Judge’s failure to dispose of pending matters must be viewed as misconduct within its jurisdiction” (id., at 297). This Court emphatically rejected the Commission’s misguided incursion, concluding that it “would overlap the jurisdiction clearly granted to those administering the courts” and “would permit the Commission to intervene in the administrative process whenever it believes that a Judge has failed to dispose of pending matters within unspecified time limits in an unspecified number of cases and on a case-by-case basis” (id., at 297). The instant case represents a far deeper incursion, insofar as the 16 nowdisciplinarily challenged rulings are concerned, because the overlap and intervention drive into the very heart of the adjudicative administration and delivery of justice by a Trial Judge.
Furthermore, I am unable to accept that removal here may be justified under an exacerbation theory, related to a series of “instances of petitioner’s inappropriate behavior in his dealings *165 with persons appearing before him, demonstrating impatience and intolerance, even at times ordering prosecutors who disagreed with him out of the courtroom” (Per Curiam opn, at 150-151). These unfit-to-serve characterizations are associated with and derived from a collection of misdeeds mixed with indecorous and indiscrete comments, admonitions, sarcasm and wisecracks. The utterances made in the rough-and-tumble world of the New York City arraignment and criminal courts are sharply contested, acontextual, selective and subjective. They also do not satisfy, on proportional record analysis, the substantive gravity needed for removal from judicial office (compare, Matter of Agresta, 64 NY2d 327 [upholding censure]).-
My reading of this record supports a contrary, or at least reasonably competing, point of view that the substance and credibility concerning many of the specifications of misconduct range from questionable-to-weak, and are subject to significant conflicting evidence favorable to the Judge’s conduct and overall performance of his judicial duties. The record fairly and fully appraised, provides reasonable-to-strong mitigating and countervailing evidence, in substantive detail and in credibility, which contradicts the negative debasings of the Judge’s character and the unfounded projection of his permanent unfitness for judicial office.
For example, various witnesses called by the Judge, and even by the Commission, portray the Judge as an unbiased and knowledgeable Judge. A good deal of criticism has been heaped on him for bias against some prosecutors whom he apparently found deficient in performance; indeed, none of them filed any contemporaneous complaints or appeals against him anywhere until he became publicly vilified. They did, however, keep negative material in personal files over the years that was retrieved and projectiled into his disciplinary proceeding.
Thus, I consider it fair to select some particular competing evidence that I find particularly relevant and cogent on the sanction weighing issue. Barry Kamins, a former prosecutor, Chair of the Grievance Committee for the Second and Eleventh Judicial Districts, past president of the Brooklyn Bar Association, and recent cochair of that Association’s Judiciary Committee, testified that he had observed Judge Duckman in court several hundred times over the years and that the Judge “is more knowledgeable about criminal law, in my opinion, than any other judge in the Criminal Court in Kings County” (Transcript, vol XVI, at 3324). He also testified that he never heard the Judge “shout or yell,” but at most “heard him speak *166 in a frustrating tone, which is not novel” (id., at 3331). He testified that the Judge “holds both sides accountable” and that there is no “double standard” (id., at 3333).
Former Judge and Acting Justice Alain Bourgeois, now a practicing attorney, also testified:
“From what I observed, he dealt with [issues] effectively, and although he was demanding of respective counsel, although he obviously held them to a high standard, I believed that he held them to an appropriate standard and an equivalent standard. I think the frustration that one feels sitting in the Criminal Court is difficult to contain; I didn’t see it spill over in any way in Judge Duckman’s handling of cases that I observed.” (Transcript, vol XVI, at 3354.)
Juda Epstein, a former prosecutor who appeared before the Judge regularly, testified that the Judge “was absolutely down the line fair,” that he did not treat the prosecution more harshly or differently from the way he treated the defense (Transcript, vol XVIII, at 3759, 3796). In fact, he testified that in one case, the defense attorney complained that the Judge was “too pro prosecutorial” (id., at 3796).
Gerald Allen, former Kings County prosecutor and former Deputy Bureau Chief of the Criminal Courts Bureau, called by the Commission, testified on cross-examination that the Judge was “definitely * * * the best trial judge in the building” (Transcript, vol VII, at 1388), and that he exhibited “almost exclusively good behavior” (id., at 1389).
These necessarily selective appraisals illustratively and strongly negate the mischaracterization of this Judge by the majority at the Commission on Judicial Conduct level (7 of 11 Commissioners). No matter how many favorable letters are assembled, however, they cannot make the case one way or the other on the appropriate sanction; no more, I respectfully submit, than the necessarily incomplete materials the Com: mission majority and this Court’s Per Curiam opinion focus and rely on, and adopt. The whole record must be evaluated.
It is, nevertheless, quite significant to me that more than 100 attorneys wrote to the Commission in early 1996 to protest the publicized ultimatums for the removal of Judge Duckman— concerning a media-intensified ruling that proved not to be misconduct. This varied array of personal letters and direct appraisals are part of the whole record. They depict an individual *167 significantly different from and somewhat better than the “mean-spirited” and “bullying” Judge, sobriqueted by the Commission as some caricaturized martinet (see, Commission majority opn, at 7). The characterizations seem to me neither accurate, nor fair.
At least for some balance, it should be observed that the numerous evidentiary letters in the “Book of Letters” are neither from partisans, nor are they of merely character reference quality. They are from ordinary lawyers, court employees and others representing a wide cross section of people and professionals who worked in and around and observed Judge Duck-man in the performance of his judicial duties over long and different periods of time. Surely, their real evidence is worthy of some consideration and greater weight than this material garnered from the Hearing Referee or the Commission itself— which apparently was naught.
These letters also provide and constitute empirical and directly relevant evidence presented as part of the defense case before the Commission on the sanction weighing issue. The credibility and lack-of-outcome interest of these many letter writers (thus enjoying some reasonable and creditable professional objectivity) are very illuminating for those who would look to the whole picture with its varying hues and textures. They are appropriate to weigh on the sanction mitigation aspects of this particular case, as this Court is exclusively obligated to do.
In sum, removing this Judge on this record represents a disproportionate redress, when examined in the dispassionate reflection of the less-than-egregious level of cobbled misconduct. This is especially so in the balance wheel of these overwhelmingly favorable, on-the-firing-line source appraisals of the Judge’s adjudicative work and good character.
The genesis, breadth and nature of the exceedingly pervasive investigation of this Judge by the Commission staff are at least also contextually noteworthy. In my view, these features raise legitimate concerns and reflect an acutely unfair methodology with questionable motivation for the Commission’s course of action. The diverse perceptions and evaluations, even among the Commission members, provide an eye opening window into understanding the skewed and distorted process that propelled itself ultimately into this divided Commission recommendation. Seven members voted to recommend the most severe sanction, and they were even divided as to some specifications; four *168 of the 11 Commissioners voted for censure only for differing reasons.
The dissenters at the Commission tendered an array of particulars for this Court to consider in mitigation of the sanction recommendation. They summarized their reasons for public censure as the sufficient level of redress, for example, as follows: (1) none of the acts committed resulted in a deprivation of liberty; (2) none of the acts was motivated by self-interest; (3) all of the improper dismissals involved misdemeanors; (4) on no occasion did prosecutors find Judge Duckman’s knowingly erroneous dismissals of cases serious enough to warrant complaints to his judicial administrative superiors or even appeals by them as “aggrieved” litigant parties (though they instead chose to stockpile grievances in personal files for future retrieval to be used in collaboration with a drumbeat to remove a Judge for an unpopular decision); and (5) the instances of misconduct are few compared to the tens of thousands of cases Judge Duckman handled in his five-year career.
My judgment coincides with that of the dissenting Commissioners: the ultimate sanction here is disproportionate to the nature, number and gravity of the proven and acknowledged judicial misdeeds, misspeaks and mishaps. Under the applicable preponderance of the evidence standard, the case for the removal penalty falls short of the extreme egregiousness necessary. Since this Court is the only and exclusive guardian of a neutral and independent adjudication of these matters, it should reject the recommended sanction. Up to now I have concentrated essentially on the individual justice aspects of this Court’s responsibility to accord to Judge Duckman all his rights of fair procedure and full review since we are his only court of review.
Now I turn to the twin tower of this Court’s role — precedential responsibility. Removal here will have an inescapably adverse impact in that quintessential universe, as it affects the vital and vibrant independence of the judicial function and branch of government. The conduct of Judges and the culture of the operation and decision-making in trial courts will be necessarily and materially altered and affected by today’s decision. Many of the effects will be hidden from view, buried in the hearts and psyches of Judges as they think, work and worry their way through a myriad of dockets and rulings, peering or at least seeming to peer over their shoulders at severely scrutinizing critics, disappointed lawyers, disgruntled litigants and the second-guessing Commission itself. Other conse *169 quences include emboldening critics towards even more deconstructive attacks on Judges and their rulings at every turn, twitch and utterance. These combined visible and invisible consequences cannot help but threaten the independence and damage the integrity of the jewel of this State’s judicial process — actually and perceptually. Fortunately, the judiciary and judicial process are strong and will survive, and so I agree with the Per Curiam opinion’s observation that this case and circumstance do not create a state of peril. Yet, this does not bode well for the deliberative administration of justice.
Lastly, to the extent made relevant on the sanction determination, this Judge acknowledged on the record the inappropriateness of many of his actions (compare, Transcript, at 33, 53, 59, 66-68, 80, 81, 86, 97-98, with Per Curiam opn, at 155-156). In fact, in my view, the over-all tenor of the Judge’s testimony and positions before the Hearing Officer, the Commission and this Court, was apologetic and contrite.
Moreover, this Court’s guiding precepts do not demand that Judges who are fighting for their professional lives and reputations must throw in the towel as part of their “defense” (compare, Matter of Kiley, 74 NY2d 364, 371, supra [removal rejected and censure imposed] [adding this Court’s wise caution against using “lack of candor” (something I would deem worse than asserted “lack of contrition”) as an aggravating circumstance to pump up a more serious sanction]). Thus, Judges should not have to “kneel penitently in the snows of Canossa” before the Commission; Judge Duckman is not Emperor Henry IV and the Commission is not Pope Gregory VII.
It should suffice that accused Judges should tell the truth, be candid and acknowledge wrongdoing that they are truly guilty of and to the extent necessary and consistent with maintaining a defense against wrongful criticisms and charges. Indeed, even an appropriate measure of remorse and resolve to conform to acceptable judicial behavior and norms are prudent and useful. On the other hand, Judges surely are not obligated to plead guilty, no matter what is thrown at them, nor are they expected to rely merely on the “mercy” of the Commission.
I vote for censure only, because I am unconvinced and unable to pronounce that this Judge is incorrigibly and irredeemably unfit to serve as a Judge ever again.
Chief Judge Kaye and Judges Smith, Levine, Ciparick and Wesley concur in Per Curiam opinion; Judge Titone dissents and votes to reject the determined sanction in a separate *170 opinion; Judge Bellacosa dissents and votes to reject the determined sanction in another dissenting opinion.
Determined sanction accepted, without costs, and Lorin M. Duckman is removed from his office of Judge of the Criminal Court of the City of New York, Kings County.